ORAL ARGUMENT NOT YET SCHEDULED
No. 14-7004 (consolidated with Nos. 14-7005 and 14-7006)

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

SAM OSBORN, et al.,

*Plaintiffs-Appellants*,

v.

VISA INC., et al.,

*Defendants-Appellees*.

_____

On Appeal from the United States District Court for the District of Columbia
Nos. 1:11-cv-1831, 1:11-cv-1882, and 1:11-cv-1803 (Hon. Amy Berman Jackson)

_____

## BRIEF FOR APPELLEES
_____

Kenneth A. Gallo
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC  20006
(202) 223-7300
kgallo@paulweiss.com

Andrew C. Finch
Gary R. Carney
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 373-3000
afinch@paulweiss.com

*Counsel for Defendants-Appellees*
*MasterCard Incorporated and*
*MasterCard International Incorporated*

Mark R. Merley
Matthew A. Eisenstein
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004
(202) 942-5000
Mark.Merley@aporter.com

*Counsel for Defendants-Appellees*
*Visa Inc., Visa U.S.A. Inc., Visa*
*International Service Association,*
*and Plus System, Inc.*

[additional counsel listed
on inside cover]

William F. Cavanaugh
PATTERSON BELKNAP WEBB &
  TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
wjcavanaugh@pbwt.com

*Counsel for Defendants-Appellees*
*Wells Fargo & Company and*
*Wells Fargo Bank, N.A.*

Peter E. Greene
Boris Bershteyn
Peter S. Julian
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
(212) 735-3000
pgreene@skadden.com

*Counsel for Defendants-Appellees*
*JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., and*
*Chase Bank USA, N.A.*

Mark P. Ladner
Michael B. Miller
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019-9601
(212) 336-4257
mladner@mofo.com

*Counsel for Defendants-Appellees*
*Bank of America Corporation,*
*Bank of America, N.A., and*
*NB Holdings Corporation*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties, Amici, and Intervenors

All parties who appeared in the district court, and who are parties in this Court, are listed in the Certificate as to Parties, Rulings, and Related Cases in the Consolidated Principal Brief for Appellants ("Pls.' Br.").  That Certificate, however, incorrectly lists BA Merchants Services LLC f/k/a National Processing, Inc. and Chase Paymentech Solutions, LLC as defendants.  Those entities were not named in any of the complaints in these cases; they did not appear in the district court; and they are not parties in this Court.  No *amici* or intervenors have appeared.

### B.    Rulings Under Review

Plaintiffs seek review of the Memorandum Opinion (JA 499-518) and Order (JA 497-98) issued on December 19, 2013 by the United States District Court for the District of Columbia, Judge Amy Berman Jackson, denying Plaintiffs' motions for leave to file second amended complaints with prejudice and denying as moot Plaintiffs' motions to alter or amend the judgment.  The December 19, 2013 Memorandum Opinion is available at 2013 WL 6671660 and has not yet been printed in the Federal Supplement.  The Certificate in Plaintiffs' brief states that Plaintiffs also seek review of the district court's Memorandum Opinion (JA 285-323; 922 F. Supp. 2d 73) and Order (JA 283-84) of February 13, 2013 granting

Defendants' Rule 12(b)(6) motions to dismiss without prejudice.  But Plaintiffs' brief states that "plaintiffs assign error only to the December 19, 2013 Order and Memorandum Opinion denying leave to amend."  Pls.' Br. 8.

## C.    Related Cases

This case was not previously on review before this Court or any other court. Counsel believe that, aside from the consolidated cases here, no related cases are pending before this Court or any other court.

## CORPORATE DISCLOSURE STATEMENT

Visa Inc. is a publicly-held corporation. Visa Inc. has no parent company, and no publicly-held company owns 10% or more of the stock of Visa Inc.

Visa U.S.A. Inc. is a non-stock corporation. Visa Inc., a publicly-held company, is a parent company of Visa U.S.A. Inc. and has a 10% or greater ownership interest in Visa U.S.A. Inc.

Visa International Service Association is a non-stock corporation. Visa Inc., a publicly-held company, is a parent company of Visa International Service Association and has a 10% or greater ownership interest in Visa International Service Association.

Plus System, Inc. is a non-stock corporation. Visa U.S.A. Inc., discussed above, is a parent company of Plus System, Inc. and has a 10% or greater ownership interest in Plus System, Inc.

MasterCard Incorporated is a publicly-held corporation. MasterCard Incorporated has no parent company, and no publicly-held company owns 10% or more of the stock of MasterCard Incorporated.

MasterCard International Incorporated is a Delaware membership corporation that does not issue capital stock, and is a wholly owned subsidiary of MasterCard Incorporated.

JPMorgan Chase & Co. is a publicly-held corporation.  JPMorgan Chase & Co. has no parent company, and no publicly-held company owns 10% or more of the stock of JPMorgan Chase & Co.

JPMorgan Chase Bank, N.A. is a wholly owned subsidiary of JPMorgan Chase & Co.  No publicly-held company other than JPMorgan Chase & Co. owns 10% or more of the stock of JPMorgan Chase Bank, N.A.

Chase Bank USA, N.A. is an indirect wholly owned subsidiary of JPMorgan Chase & Co.  No publicly-held company other than JPMorgan Chase & Co. owns 10% or more of the stock of Chase Bank USA, N.A.

Bank of America Corporation is a publicly-held corporation, and no publicly-held corporation owns 10% or more of Bank of America Corporation's stock.

Bank of America Corporation is the only publicly-held corporation that owns 10% or more of the stock of Bank of America, N.A.

Bank of America Corporation is the only publicly-held corporation that owns 10% or more of the stock of NB Holdings Corporation.

Wells Fargo & Company is a publicly-held corporation, and no publicly held corporation owns 10% or more of Wells Fargo & Company's stock.

Wells Fargo & Company is the only publicly-held corporation that owns 10% or more of the stock of Wells Fargo Bank, N.A.

iv

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ...................................... iii

TABLE OF AUTHORITIES ................................................. vii

GLOSSARY OF ABBREVIATIONS ................................................. xi

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES ........................................................ 1

STATUTES AND REGULATIONS ........................................................ 2

STATEMENT OF THE CASE ........................................................ 2

    A.    Plaintiffs' First Amended Complaints ................................. 4

    B.    The District Court's Decision Dismissing Plaintiffs' Actions ............. 8

    C.    Plaintiffs' Motions to Alter or Amend the Judgment and for Leave to File Proposed Second Amended Complaints .................................. 11

    D.    The District Court's Decision Denying Leave to Amend and Denying as Moot the Motions to Alter or Amend the Judgment ........ 14

STANDARD OF REVIEW ........................................................ 16

SUMMARY OF ARGUMENT ........................................................ 16

ARGUMENT ........................................................ 19

I.    THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS' PROPOSED SECOND AMENDED COMPLAINTS FAILED TO PLEAD FACTS THAT COULD ESTABLISH INJURY-IN-FACT .......... 19

    A.    Private Antitrust Plaintiffs Must Allege Facts That Could Establish Injury-in-Fact Resulting from the Alleged Violation ........................ 20

    B.    All Plaintiffs Failed to Allege Facts That Could Establish Their Purported Injuries Based on ATM Operators' Alleged Inability to Persuade Consumers to Use "Lower Cost" ATM Networks ............. 23

1.  Plaintiffs Admit That ATM Operators Already Complete Consumers' ATM Transactions Over the "Lowest Cost" Networks Available, Notwithstanding the Challenged Rules ..24

2.  Plaintiffs Did Not Allege That Consumers Have the Ability to Choose the ATM Network Over Which Their ATM Transactions Are Routed..........................................................28

3.  The Consumer Plaintiffs' Theory That Card-Issuing Banks Might Enable Cards to Use More Networks Is Based on an Attenuated and Speculative Chain of Events............................31

II.  THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS' PROPOSED SECOND AMENDED COMPLAINTS FAILED TO PLEAD FACTS THAT COULD ESTABLISH AN ANTITRUST CONSPIRACY ...............................................................36

A.  Plaintiffs Did Not Allege Facts That Could Establish a Horizontal Agreement Among the Bank Members of Visa or MasterCard .........38

1.  Allegations That Banks Were Members of Visa or MasterCard and Agreed to Follow its Network Rules Could Not Establish That the Banks Agreed Horizontally .................38

2.  Plaintiffs Alleged No Facts That Could Establish a Horizontal Agreement Under *American Needle* ......................42

3.  Plaintiffs Alleged No Facts That Could Establish That the Banks Agreed Horizontally with Each Other in a "Hub and Spoke" Conspiracy...................................................44

B.  Plaintiffs Did Not Allege Facts That Could Establish Vertical Conspiracies Among Individual Banks and Visa or MasterCard .......47

III.  ALTERNATIVELY, THIS COURT CAN AFFIRM THE DECISION BELOW ON THE GROUND THAT PLAINTIFFS CANNOT MEET THE STANDARD TO ALTER OR AMEND THE JUDGMENT...............52

CONCLUSION ......................................................................55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

vi

# TABLE OF AUTHORITIES

CASES                                                                Page(s)

*AD/SAT, A Div. of Skylight, Inc. v. Associated Press*,
  181 F.3d 216 (2d Cir. 1999) ............................................................40

*Am. Airlines v. Christensen*,
  967 F.2d 410 (10th Cir. 1992) ........................................................48

*Am. Needle, Inc. v. NFL*,
  560 U.S. 183 (2010)...............................................................42, 43

*Andrx Pharm., Inc. v. Biovail Corp. Int'l*,
  256 F.3d 799 (D.C. Cir. 2001).................................21, 22, 31, 32, 35

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................22, 27

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
  Carpenters*,
  459 U.S. 519 (1983).................................................................31, 32

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................36, 37

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)......................................................................21

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) ............................................................37

*Ciralsky v. CIA*,
  355 F.3d 661 (D.C. Cir. 2004)...................................................53, 54

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) .............................................44, 49, 50

*Dominguez v. UAL Corp.*,
  666 F.3d 1359 (D.C. Cir. 2012)......................................................20

\*   Authorities upon which we chiefly rely are marked with asterisks.

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n,
    663 F.2d 253 (D.C. Cir. 1981) ............................................................39

Gatt Commc'ns, Inc. v. PMC Assoc., L.L.C.,
    711 F.3d 68 (2d Cir. 2013) ..............................................................35

Hettinga v. United States,
    677 F.3d 471 (D.C. Cir. 2012) ..........................................................16

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.,
    602 F.3d 237 (3d Cir. 2010) .......................................................50, 52

In re Ins. Brokerage Antitrust Litig.,
    618 F.3d 300 (3d Cir. 2010) ........................................................44, 47

In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,
    No. 05-MD-1720, 2008 WL 5082872 (E.D.N.Y. Nov. 25, 2008) ....................41

Interstate Circuit, Inc. v. United States,
    306 U.S. 208 (1939)....................................................................45, 46

James Madison Ltd., by Hecht v. Ludwig,
    82 F.3d 1085 (D.C. Cir. 1996)..........................................................16

*Kendall v. Visa U.S.A., Inc.,
    518 F.3d 1042 (9th Cir. 2008) ....................................................39, 40, 41

Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,
    551 U.S. 877 (2007)......................................................................49

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992)......................................................................20

Matsushita Elec. v. Zenith Radio Corp.,
    475 U.S. 574 (1986)......................................................................47

Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.,
    709 F.3d 129 (2d Cir. 2013) ............................................................37

Monsanto Co. v. Spray-Rite Serv. Corp.,
    465 U.S. 752 (1984)..................................................................37, 48

*Okusami v. Psychiatric Inst. of Wash., Inc.*,
    959 F.2d 1062 (D.C. Cir. 1992) ...........................................................37

*PepsiCo v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) ...........................................................44, 47

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
    615 F.3d 412 (5th Cir. 2010) ...........................................................44, 49

*Robertson v. Sea Pines Real Estate Cos.*,
    679 F.3d 278 (4th Cir. 2012) ...........................................................40, 41

*Serv. Emps. Int'l Union Health and Welfare Fund v. Philip Morris Inc.*,
    249 F.3d 1068 (D.C. Cir. 2001)...........................................................32

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ...........................................................22, 27

*Toscano v. Prof'l Golfers' Ass'n*,
    258 F.3d 978 (9th Cir. 2001) ...........................................................48

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ...........................................................44

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ...........................................................45, 46

*United States v. Mathis*,
    216 F.3d 18 (D.C. Cir. 2000)...........................................................44

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978)...........................................................42

*Viazis v. Am. Ass'n of Orthodontists*,
    314 F.3d 758 (5th Cir. 2002) ...........................................................40

**STATUTES**

15 U.S.C. § 1 ...........................................................3, 36

15 U.S.C. § 15(a) ...........................................................1, 20, 21, 31

15 U.S.C. § 26...........................................................21

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1332(d) ..........................................................................1

28 U.S.C. § 1337 ...............................................................................1

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6) ...........................................................8, 22

Fed. R. Civ. P. 15(a) .............................................................11, 54

Fed. R. Civ. P. 58 ......................................................................10

Fed. R. Civ. P. 59(e) ...........................................2, 11, 19, 53, 54

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ATM | Automated Teller Machine |
| Visa | Visa Inc., Visa U.S.A. Inc., Visa International Service Association, and Plus System, Inc. |
| MasterCard | MasterCard Incorporated and MasterCard International Incorporated |
| IPO | Initial Public Offering |
| NFL | National Football League |
| FDA | U.S. Food and Drug Administration |
| *NAC* Compl. | First Amended Complaint in *National ATM Council, Inc., et al. v. Visa Inc., et al.*, No. 1:11-cv-01803 |
| *Osborn* Compl. | First Amended Complaint in *Andrew Mackmin, et al. v. Visa Inc., et al.*, No. 1:11-cv-01831 |
| *Stoumbos* Compl. | First Amended Complaint in *Mary Stoumbos v. Visa Inc., et al.*, No. 1:11-cv-01882 |
| *NAC* Prop. Compl. | Proposed Second Amended Complaint in *National ATM Council, Inc., et al. v. Visa Inc., et al.*, No. 1:11-cv-01803 |
| *Osborn* Prop. Compl. | Proposed Second Amended Complaint in *Andrew Mackmin, et al. v. Visa Inc., et al.*, No. 1:11-cv-01831 |
| *Stoumbos* Prop. Compl. | Proposed Second Amended Complaint in *Mary Stoumbos v. Visa Inc., et al.*, No. 1:11-cv-01882 |

## STATEMENT OF JURISDICTION

Plaintiffs-Appellants asserted claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, against Defendants-Appellees Visa Inc., Visa U.S.A. Inc., Visa International Service Association, and Plus System, Inc. (collectively "Visa"), MasterCard Incorporated and MasterCard International Incorporated (collectively "MasterCard"), and several banks.  Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337.  JA 1, 21, 47.

This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's December 19, 2013 Memorandum Opinion (JA 499) and Order (JA 497) denying Plaintiffs' motions for leave to amend their complaints with prejudice and denying as moot Plaintiffs' motions to alter or amend the court's February 13, 2013 judgment.  That judgment dismissed the cases without prejudice for failure to state a claim upon which relief can be granted.  JA 285 (Mem. Op.); JA 283 (Order).

## STATEMENT OF THE ISSUES

1.     Whether the district court correctly held that Plaintiffs' proposed second amended complaints — like their dismissed first amended complaints — failed to allege facts that could establish injury-in-fact resulting from the challenged Visa and MasterCard ATM access fee rules.

2.      Whether the district court correctly held that Plaintiffs' proposed second amended complaints — like their dismissed first amended complaints — failed to allege facts that could establish an antitrust conspiracy to impose the challenged Visa and MasterCard ATM access fee rules.

3.      Alternatively, even if Plaintiffs' proposed second amended complaints alleged facts sufficient to establish injury-in-fact and an antitrust conspiracy, whether Plaintiffs can amend their complaints, and thus seek to toll the statute of limitations, when Plaintiffs did not — and cannot — satisfy the standard under Rule 59(e) to alter or amend the district court's judgment dismissing these cases.

## STATUTES AND REGULATIONS

The relevant statutes are set forth in the Addendum to Plaintiffs' brief.

## STATEMENT OF THE CASE

Banks and non-bank entities operate ATMs at which consumers can use debit or ATM cards to withdraw cash, deposit checks, and conduct various other transactions.  There is typically no charge to a consumer for using an ATM that is operated by the consumer's own bank.  But to use an ATM operated by a different bank or by a non-bank entity, the consumer usually must pay an "access fee" to the ATM operator.  In this "foreign ATM transaction," the consumer also may pay a "foreign ATM fee" to his or her own bank, but those fees are not at issue here.  In addition to the fees paid by the consumer, the card-issuing bank pays an

2

"interchange fee," which the ATM network transmits to the ATM operator after deducting a "network fee."  Plaintiffs refer to the amount remitted as "net interchange."

Plaintiffs are five consumers who allegedly paid ATM access fees for conducting "foreign ATM transactions," as well as several non-bank entities that operate ATMs and a trade association of non-bank ATM operators.  Plaintiffs claim that Visa's and MasterCard's respective rules regarding ATM access fees violate Section 1 of the Sherman Act, 15 U.S.C. § 1.  The ATM operator plaintiffs claim that the challenged rules cause ATM operators to pay excessive network fees and thus to receive lower net interchange revenue.  The consumer plaintiffs claim that those rules cause consumers to pay excessive access fees to ATM operators.

The district court dismissed Plaintiffs' cases because their first amended complaints did not allege facts that could establish either injury-in-fact resulting from, or an antitrust conspiracy to impose, the challenged Visa and MasterCard rules.  JA 285.  Thereafter, the court denied Plaintiffs' motions for leave to amend their complaints as futile because Plaintiffs' proposed second amended complaints failed to remedy either defect.  JA 499.  Plaintiffs challenge only the court's second decision denying leave to amend and effectively ignore the court's first decision dismissing the cases.  *See* Pls.' Br. 8.  But the first decision provides important context for, and is cited throughout, the second.

3

### A.    Plaintiffs' First Amended Complaints

Plaintiffs filed these antitrust cases in October 2011.  *See* Doc. 1 (No. 1:11-cv-01831); Doc. 1 (No. 1:11-cv-01882); Doc. 1 (No. 1:11-cv-01803).  Before Defendants responded, Plaintiffs filed amended complaints.  JA 47-114 ("*Osborn* Compl."); JA 1-20 ("*Stoumbos* Compl."); JA 21-46 ("*NAC* Compl.").  Plaintiffs' first amended complaints alleged, in relevant part, as follows:

Defendants Visa and MasterCard have been publicly held corporations since their respective initial public offerings ("IPOs") on March 18, 2008 and May 24, 2006.  JA 58 (*Osborn* Compl. ¶ 44); JA 4 (*Stoumbos* Compl. ¶ 20); JA 29 (*NAC* Compl. ¶ 30).  Before their IPOs, Visa and MasterCard allegedly were associations comprising, and owned by, their respective bank members.  JA 58 (*Osborn* Compl. ¶ 44); JA 4 (*Stoumbos* Compl. ¶ 20); JA 29 (*NAC* Compl. ¶ 30).  Plaintiffs alleged that after the IPOs, the banks continued to hold non-equity membership interests in Visa and MasterCard subsidiaries, and that the largest banks held equity interests in Visa or MasterCard.  JA 58 (*Osborn* Compl. ¶ 44); JA 4-5 (*Stoumbos* Compl. ¶ 21); JA 29 (*NAC* Compl. ¶ 30).  The *Osborn* complaint also named three of those banks as defendants.  JA 55-57 (*Osborn* Compl. ¶¶ 28-43).

Visa and MasterCard each have an ATM network, which both bank and non-bank ATM operators may use to connect to the bank where a consumer has an account in order to process the consumer's cash withdrawal or other ATM

4

transaction.  JA 59-62 (*Osborn* Compl. ¶¶ 50-64); JA 7-9 (*Stoumbos* Compl. ¶¶ 25-29); JA 30-33 (*NAC* Compl. ¶¶ 33-39).  The Visa "Plus" ATM network and the MasterCard "Cirrus" ATM network compete with each other and many other ATM networks — including STAR, NYCE, ACCEL/Exchange, Credit Union 24, CO-OP, Shazam, and Transfund — in providing ATM processing services.  JA 62-63 (*Osborn* Compl. ¶ 66); JA 8 (*Stoumbos* Compl. ¶ 28); JA 32 (*NAC* Compl. ¶ 38). Visa- and MasterCard-branded cards that offer access to other ATM networks often have logos (or "bugs") on the back indicating which networks can be accessed.  JA 62-63 (*Osborn* Compl. ¶ 66); JA 8 (*Stoumbos* Compl. ¶ 28); JA 32 (*NAC* Compl. ¶ 38).

Visa's Plus ATM network and MasterCard's Cirrus ATM network each have adopted rules that apply to ATM operators that choose to process ATM transactions over its network.  Each network's rules include a provision that bars ATM operators from charging a consumer a higher access fee for processing the consumer's ATM transaction over its network than over a different ATM network. For example, a consumer whose transaction is processed on the Plus network cannot be charged a higher access fee than the operator would charge for processing that transaction on the STAR network.  JA 63-64 (*Osborn* Compl. ¶¶ 69-70); JA 9 (*Stoumbos* Compl. ¶¶ 31-32); JA 33-34 (*NAC* Compl. ¶¶ 41-42).

Specifically, Visa's Plus network Operating Regulation 4.10A provides:

> An ATM Acquirer [*i.e.*, operator] may impose an Access Fee if:
>
> It imposes an Access Fee on all other Financial Transactions through other shared networks at the same ATM;
>
> The Access Fee is not greater than the Access Fee amount on all other Interchange Transactions through other shared networks at the same ATM . . . .

JA 63 (*Osborn* Compl. ¶ 69); JA 9 (*Stoumbos* Compl. ¶ 31); JA 33 (*NAC* Compl.

¶ 41). MasterCard's Cirrus network Worldwide Operating Rule 7.13.1.2 provides:

> An Acquirer must not charge an ATM Access Fee in connection with a Transaction that is greater than the amount of any ATM Access Fee charged by that Acquirer in connection with the transactions of any other network accepted at that terminal.

JA 64 (*Osborn* Compl. ¶ 70); JA 9 (*Stoumbos* Compl. ¶ 32); JA 34 (*NAC* Compl.

¶ 42).

Plaintiffs alleged that those network rules were the product of "horizontal" agreements among bank members of Visa's Plus ATM network and Visa, and among bank members of MasterCard's Cirrus ATM network and MasterCard, to "fix" ATM access fees. JA 64, 77-78 (*Osborn* Compl. ¶¶ 72, 106-11); JA 10, 14 (*Stoumbos* Compl. ¶¶ 34, 48-52); JA 34, 41-42 (*NAC* Compl. ¶¶ 43, 64-68). Plaintiffs further alleged that the challenged rules prevent ATM operators from "offer[ing] discounts or any other benefit or inducement to persuade consumers to complete their transactions over competing, lower cost [ATM] networks . . . ." JA

6

65 (*Osborn* Compl. ¶ 75); *accord* JA 10 (*Stoumbos* Compl. ¶ 36); JA 35 (*NAC*

Compl. ¶ 45).  But Plaintiffs' complaints failed to allege that consumers have the

ability to choose the network over which their ATM transactions are completed, or

that ATM operators do not already route transactions over "lower cost" networks.

Indeed, at the hearing on Defendants' motions to dismiss, Plaintiffs explained that

ATM operators, not consumers, choose the network over which to complete

consumers' transactions, and that ATM operators already route transactions over

the lowest cost network available, notwithstanding the challenged rules.  JA 312.

Plaintiffs also explained that by "lower cost" networks, Plaintiffs actually mean

networks that remit higher net interchange fees to ATM operators.  JA 311-12.

The ATM operator plaintiffs nevertheless claimed that ATM operators'

alleged inability to offer discounts or other benefits to persuade consumers to

complete transactions over higher paying ATM networks "prevents ATM operators

from setting profit-maximizing prices" to consumers.  JA 35 (*NAC* Compl. ¶ 45).

The consumer plaintiffs claimed that ATM operators' alleged inability to offer

those discounts or benefits leads consumers to pay "supra-competitive prices for

ATM Access Fees" to ATM operators.  JA 65 (*Osborn* Compl. ¶ 76); *see also* JA

11 (*Stoumbos* Compl. ¶ 38) (consumers "pay higher ATM Access Fees").

###### B.     The District Court's Decision Dismissing Plaintiffs' Actions

The district court granted Defendants' Rule 12(b)(6) motions and dismissed the cases without prejudice because Plaintiffs' first amended complaints failed to plead injury-in-fact or an antitrust conspiracy.  JA 283-84; JA 285-322.

*First*, the district court explained that to have standing to assert an antitrust claim, a plaintiff "must show two things:  (1) that the defendant's alleged wrongdoing has caused him to suffer an injury in fact that affects his business or property; and (2) that the injury is the kind of injury the antitrust laws were intended to prevent."  JA 295-96.  To satisfy the first showing of injury-in-fact, a "plaintiff must personally suffer the harm," a requirement that "in antitrust cases mirrors the Article III constitutional standing requirement that all plaintiffs in federal cases must satisfy."  JA 296.  The court further explained that "[i]njury in fact requires a plaintiff to allege an injury that is both concrete and particularized and actual or imminent, rather than speculative or generalized."  JA 296 n.9.

The court concluded that both the ATM operator plaintiffs and the consumer plaintiffs failed to allege facts that could establish injury-in-fact.  All Plaintiffs' alleged injuries, the court explained, were predicated on the assertion that "[b]y preventing ATM operators from charging different ATM access fees to consumers based on the networks their [debit or ATM] cards can access," the rules "effectively prohibit operators from discounting, rebating, or directing consumers

8

to less expensive networks." JA 292. But, the court found, Plaintiffs failed to allege (1) that there are "lower cost" ATM networks, (2) that ATM operators do not already complete ATM transactions over the "lowest cost" network, or (3) that consumers have the ability to choose the ATM network over which their transactions are completed. JA 302-13. Thus, Plaintiffs "failed to satisfy the first prong of the antitrust injury: injury in fact." JA 313 n.16.

As the court noted, Plaintiffs at oral argument "advanced a different theory" that, but for the challenged rules, "consumers would start to demand that their banks issue cards branded with the alternative [ATM network] marks, and there would be more competition among networks at *that* point in the chain." JA 312-13 (emphasis in original). But the court declined to address the merits of that theory, because "it is not alleged in the complaints." JA 313.

*Second*, the district court explained that "the existence of an agreement or conspiracy is an essential element of a Sherman Act violation." JA 297. A claim under Section 1 of the Sherman Act requires proof that "the challenged anticompetitive conduct stems from . . . an agreement, tacit or express." JA 298 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007)). Thus, to avoid dismissal, "plaintiffs must allege . . . the existence of an agreement or conspiracy, or facts sufficient to support the inference of an agreement or conspiracy." JA 298. In assessing whether a plaintiff has satisfied that requirement, the court explained,

9

a "statement of parallel conduct alone, without factual allegations to plausibly suggest an illegal agreement, is not enough."  JA 318.  Nor is it sufficient to allege conduct that would be "in each [defendant's] independent self-interest."  JA 320.

The court held that Plaintiffs failed to allege facts that could establish the challenged rules were the product of an agreement among banks to restrain trade. JA 314-22.  The court found that Plaintiffs' claim "of a horizontal conspiracy arises from the prior existence of the bankcard associations" — before the Visa and MasterCard IPOs — and that "[n]one of the complaints allege that the banks agreed among themselves to do anything."  JA 315.  But, the court held, "membership in an association — much less in a defunct association — is not enough to establish agreement or conspiracy."  JA 317.  The court also held that Plaintiffs failed to allege any "facts to suggest the existence of either an actual or tacit agreement among banks to restrain trade by individually agreeing to the Visa and MasterCard agreements."  JA 318.

The court did not conclude that Plaintiffs "could never make factual allegations to support their claims . . . ."  JA 322.  But the court did not grant Plaintiffs leave to amend their complaints, each of which already had been amended once.  Rather, pursuant to Rule 58, which governs the entry of judgment, the court ordered that "the above-captioned cases are DISMISSED without prejudice."  JA 284.

10

## C.     Plaintiffs' Motions to Alter or Amend the Judgment and for Leave to File Proposed Second Amended Complaints

Thereafter, Plaintiffs filed motions to alter or amend the court's judgment under Rule 59(e) to order the dismissal of only Plaintiffs' first amended complaints, and not the "cases," so that Plaintiffs could seek leave to amend their complaints.  Doc. 36 (No. 1:11-cv-01803); Doc. 59 (No. 1:11-cv-01831); Doc. 29 (No. 1:11-cv-01882).  Defendants opposed those motions.  Defendants stated that "Plaintiffs may file new actions if they desire to pursue their claims against defendants and believe that they can allege claims that would not be subject to dismissal.  But plaintiffs are not entitled to amend their complaints in the dismissed actions, and thus seek to toll the statute of limitations," because they failed to "satisfy the stringent requirements of Rule 59(e)."  Doc. 60 at 2 (No. 1:11-cv-01831); Doc. 37 at 2 (No. 1:11-cv-01803); Doc. 30 at 2 (No. 1:11-cv-01882).

While their Rule 59(e) motions were pending, Plaintiffs filed separate motions for leave to amend under Rule 15(a) along with their proposed second amended complaints.  JA 369-452 ("*Osborn* Prop. Compl."); JA 453-96 ("*Stoumbos* Prop. Compl."); JA 325-68 ("*NAC* Prop. Compl.").

The proposed amended complaints continued to allege that the challenged rules prevent ATM operators from offering discounts or other benefits to persuade consumers to complete their transactions over "lower cost" ATM networks.  JA 395 (*Osborn* Prop. Compl. ¶ 95); JA 464 (*Stoumbos* Prop. Compl. ¶ 45); JA 328

11

(*NAC* Prop. Compl. ¶ 1).  Plaintiffs added allegations admitting that by "lower cost" ATM networks, Plaintiffs actually mean "higher paying" networks. Specifically, Plaintiffs alleged that in a foreign ATM transaction, the card-issuing bank pays an "interchange" fee, which the network transmits to the ATM operator after deducting a "network fee."  JA 343-44 (*NAC* Prop. Compl. ¶¶ 56-58); JA 385-86 (*Osborn* Prop. Compl. ¶¶ 63-64); JA 475 (*Stoumbos* Prop. Compl. ¶ 71). Plaintiffs alleged that Visa and MasterCard charge higher network fees — and thus remit lower "net interchange" to ATM operators — than other ATM networks do. JA 344 (*NAC* Prop. Compl. ¶ 58); JA 393-94 (*Osborn* Prop. Compl. ¶¶ 91-93); JA 476 (*Stoumbos* Prop. Compl. ¶ 74).  The ATM operator plaintiffs alleged that the challenged ATM access fee rules allow Visa and MasterCard to charge "artificially high network fees" to ATM operators.  JA 351 (*NAC* Prop. Compl. ¶ 82).  The consumer plaintiffs again alleged that they are injured by having to pay excessive access fees to ATM operators.  JA 397 (*Osborn* Prop. Compl. ¶ 103); JA 483 (*Stoumbos* Prop. Compl. ¶ 93).

Plaintiffs also again admitted that ATM operators already can and do route consumers' transactions over the highest paying network available, notwithstanding the challenged ATM access fee rules.  JA 337 (*NAC* Prop. Compl. ¶ 41); JA 385, 395 (*Osborn* Prop. Compl. ¶¶ 59, 97); JA 463-64 (*Stoumbos* Prop. Compl. ¶ 43).  And Plaintiffs again failed to allege that consumers have the ability

12

to choose the network over which their ATM transactions are completed. The consumer plaintiff in *Stoumbos* alleged only that ATM software "can also be programmed to show on the screen what discounted Access Fee the cardholder will receive for the rival network Bugs on his or her card, and can inform the customer that he or she will not receive an available discount because his or her card does not have a rival network Bug." JA 480 (*Stoumbos* Prop. Compl. ¶ 85).

The ATM operator plaintiffs alleged in conclusory fashion that "[e]ven the threat of differential pricing would drive competition among networks to charge lower and more competitive network fees." JA 351 (*NAC* Prop. Compl. ¶ 83). The consumer plaintiffs in *Osborn* similarly alleged that "[e]ven the *threat* of price competition would result in lower ATM access fees." JA 398 (*Osborn* Prop. Compl. ¶ 106) (emphasis in original). But neither proposed amended complaint attempted to explain why or how these hypothetical threats would lead to higher net interchange fees for ATM operators or lower ATM access fees for consumers.

The consumer plaintiffs' proposed amended complaints also added allegations echoing a theory advanced at the motion to dismiss hearing. The plaintiff in *Stoumbos* alleged that, but for the challenged rules, "as consumers become knowledgeable and aware that ATMs offer discount Access Fees for cards with rival network Bugs, consumers will exercise their choice to seek out and use cards embossed with rival Bugs." JA 480-81 (*Stoumbos* Prop. Compl. ¶ 86). The

13

plaintiffs in *Osborn* similarly alleged that "ATM networks could advertise to customers to demand that banks add their 'bug' to their debit cards in order to pay lower transaction fees." JA 397 (*Osborn* Prop. Compl. ¶ 104). But as described below, Plaintiffs did not plead — much less allege facts to support — the assumptions underlying this theory.

### D.     The District Court's Decision Denying Leave to Amend and Denying as Moot the Motions to Alter or Amend the Judgment

The district court denied Plaintiffs' motions for leave to amend their complaints, with prejudice, because "the amendments in all three cases would be futile." JA 501.

*First*, the court found that Plaintiffs still failed to plead facts that could establish injury-in-fact. The ATM operator plaintiffs again conceded that "ATM operators already route transactions through whatever network is available that pays them the highest net interchange." JA 509. Thus, "even if consumers lack a choice at the point of the transaction, the operators have the means already in place to maximize their profits." JA 510. Moreover, the court rejected the theory that "in the absence of the access fee rules, ATM operators would offer consumers differentiated access fees at the point of transaction, consumers would then demand multi-bug [debit] cards from their banks, [and] their banks would provide these cards . . . ." JA 511. This theory, the court found, "is based on an attenuated,

14

speculative chain of events, that relies on numerous independent actors, including the [debit or ATM] card issuing banks." JA 512.

Similarly, the court found that the consumer plaintiffs "could not have suffered an actual current injury," because they did not "allege that consumers have the ability to choose which network will be used to transmit their transactions . . . ." JA 514. Moreover, the court concluded that the consumer plaintiffs' theories of injury "are highly conclusory, and they depend on a series of actions by multiple, independent actors who are not before the Court." JA 515.

*Second*, the court found that Plaintiffs' proposed amended complaints "provide no additional facts that constitute direct evidence of agreements that would support a claim of a current horizontal conspiracy among member banks." JA 516. Plaintiffs' allegations that banks "were members of the bankcard associations do not suffice to allege a current agreement," the court held. JA 515. And Plaintiffs "failed to allege that the member banks of Visa or MasterCard agreed among themselves to do anything." JA 515. Further, although the consumer plaintiffs alleged that "the access fee rules are not in the individual interests of [Visa's and MasterCard's] member banks," the court found that "other alleged facts indicate that banks have reasons to join or stay in the Visa and MasterCard networks based on their individual interests." JA 517. Thus, "the conspiracy claims lack the one thing they need: a conspiracy." JA 518.

15

Given its denial of leave to amend the complaints, the court denied as moot Plaintiffs' motions to alter or amend the judgment. JA 518. This appeal followed.

## STANDARD OF REVIEW

This Court "review[s] a district court's denial of a motion for leave to amend a complaint for abuse of discretion, requiring only that the court based its ruling on a valid ground." *James Madison Ltd., by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996) (citations omitted). One valid ground for denying leave to amend a complaint is futility. "A district court may deny a motion to amend a complaint as futile if the proposed claim would not survive a motion to dismiss." *Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012).

## SUMMARY OF ARGUMENT

The district court's decision denying Plaintiffs' motions for leave to amend their complaints is correct and should be affirmed.

I.     Plaintiffs' proposed second amended complaints — like their dismissed first amended complaints — did not allege facts that could establish injury-in-fact resulting from the Visa and MasterCard ATM access fee rules. To survive dismissal, a private antitrust plaintiff's complaint must allege facts that could establish that the plaintiff suffered injury-in-fact as a result of the challenged conduct. Absent factual allegations that could show injury-in-fact, a plaintiff lacks standing to bring a Clayton Act claim.

16

Plaintiffs' proposed amended complaints continued to assert that the challenged rules prevent ATM operators from offering discounts to persuade consumers to complete their transactions over "lower cost," higher paying ATM networks.  As a result, Plaintiffs alleged, ATM operators paid excessive network fees and consumers paid excessive access fees.  For the reasons the district court previously set forth in dismissing the cases, Plaintiffs failed to allege facts that could establish these purported injuries.  First, Plaintiffs again admitted that ATM operators already can and do route consumers' ATM transactions over the highest paying network available, even with the challenged rules in place.  Second, Plaintiffs did not allege that consumers have the ability to choose the network over which their ATM transactions are completed.

Consequently, the ATM operator plaintiffs acknowledged they already are maximizing profits and alleged no other facts showing that the challenged access fee rules lead to excessive network fees.  Additionally, the consumer plaintiffs' proposed amended complaints alleged at most that, but for the challenged rules, consumers would have asked their banks for new cards, or opened new deposit accounts to get new cards, that could be used to complete transactions over additional ATM networks.  But that allegation could not demonstrate injury-in-fact without proof of an attenuated and speculative chain of hypothesized events that

17

Plaintiffs did not even attempt to plead, much less allege facts to support.
Plaintiffs thus failed to plead injury-in-fact.

II.    Plaintiffs' proposed amended complaints also did not remedy their
failure to allege facts sufficient to show an antitrust conspiracy to impose the
challenged rules.  Plaintiffs continued to rely on the same allegations that the
district court correctly held were inadequate to show a conspiracy among banks
and Visa or MasterCard — *i.e.*, that banks were members and owners of Visa or
MasterCard before their respective IPOs and continue to follow Visa or
MasterCard ATM network rules.  Plaintiffs still did not allege any inter-bank
communications or other facts showing an agreement among the banks and Visa or
MasterCard regarding the challenged rules, or that the banks acted against self-
interest in participating in the networks.

Although the proposed amended complaints attempted to characterize the
same alleged conspiracy as "vertical" as well as "horizontal," Plaintiffs still failed
to allege facts that could show each bank and Visa or MasterCard had a conscious
commitment to a common scheme to achieve an unlawful objective through the
challenged rules.  Moreover, because Plaintiffs alleged no facts to show any
individual bank defendant's market power or share in any purported ATM services
market, their purported vertical claims fail as a matter of law.

18

III.    In all events, Plaintiffs could not file amended complaints in these dismissed cases, and thus seek to toll the statute of limitations, unless the district court first altered or amended its judgment under Rule 59(e) to allow Plaintiffs to do so.  The district court denied Plaintiffs' Rule 59(e) motions as moot.  But if the issue is not moot, this Court should affirm the decision below on the alternative ground that Plaintiffs did not — and cannot — meet the standard under Rule 59(e) to alter or amend a judgment.  Specifically, Plaintiffs cannot show any intervening change of controlling law or new evidence since the district court's judgment, or that the judgment reflects any clear error or manifest injustice.

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS' PROPOSED SECOND AMENDED COMPLAINTS FAILED TO PLEAD FACTS THAT COULD ESTABLISH INJURY-IN-FACT

The district court dismissed these cases because Plaintiffs' complaints did not allege facts that could establish injury-in-fact, as required to demonstrate antitrust standing.  The court later denied leave to amend because Plaintiffs' proposed amended complaints did not allege facts that could establish injury-in-fact, as necessary for Article III standing.

The key pleading defects in both the dismissed complaints and the proposed amended complaints are the same.  Thus, whether the question is viewed as one of

antitrust standing or Article III standing, the district court correctly held that

Plaintiffs' failure to plead injury-in-fact is fatal to their claims.

### A.    Private Antitrust Plaintiffs Must Allege Facts That Could Establish Injury-in-Fact Resulting from the Alleged Violation

Every plaintiff in federal court must allege injury-in-fact. *Dominguez v.*

*UAL Corp.*, 666 F.3d 1359, 1361 (D.C. Cir. 2012). "The requirement that a

plaintiff have standing 'is an essential and unchanging part of the case-or-

controversy requirement of Article III.'" *Id.* (quoting *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560 (1992)). "Every plaintiff in federal court bears the

burden of establishing the three elements that make up the 'irreducible

constitutional minimum' of Article III standing:  injury-in-fact, causation, and

redressibility." *Id.* at 1362 (citing *Lujan*, 504 U.S. at 560-61).  The plaintiff's

injury-in-fact must be "concrete and particularized" and "actual or imminent, not

conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks

omitted).  In *Dominguez*, this Court rejected a consumer's antitrust claims because

the consumer failed to establish, on summary judgment, that he "was overcharged

as a result of the [defendant airline's] policy" prohibiting ticket resale.  666 F.3d at

1363.  Thus, the plaintiff did not establish that he suffered an Article III injury-in-

fact. *Id.* at 1361-62.

In addition to the injury-in-fact component of Article III standing, a private

antitrust plaintiff must allege injury-in-fact to state a claim for relief under the

20

Clayton Act.  Section 4 of the Clayton Act provides a treble damages remedy to a "person who shall be *injured in his business or property* by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a) (emphasis added).  This provision "makes awards available only to injured parties." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977).  Section 16 of the Clayton Act similarly allows a person facing "threatened *loss or damage* by a violation of antitrust laws" to seek injunctive relief.  15 U.S.C. § 26 (emphasis added).

Accordingly, "[a]n antitrust plaintiff must establish an injury-in-fact or a threatened injury-in-fact caused by the defendant's alleged wrongdoing." *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806 (D.C. Cir. 2001) (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983)); *accord id.* ("As in any civil action for damages, the plaintiff in a private antitrust lawsuit must show that the defendant's illegal conduct caused its injury.").  "Moreover, the injury must affect the plaintiff's business or property and be the kind of injury the antitrust laws were intended to prevent; it must 'flow[] from that which makes defendants' acts unlawful.'" *Id.* (quoting *Brunswick*, 429 U.S. at 489).  "Additional factors to be considered in determining whether the plaintiff has 'antitrust standing' include:  the directness of the injury, whether the claim for damages is 'speculative,' the existence of more direct

21

victims, the potential for duplicative recovery and the complexity of apportioning damages." *Id.* (citing *Associated Gen. Contractors*, 459 U.S. at 542-45).

At the pleading stage, "[t]he plaintiff's first step is to plead an injury-in-fact or, in a suit for equitable relief, a threatened injury-in-fact to business or property." *Andrx*, 256 F.3d at 806. To survive dismissal, a plaintiff's complaint "must contain sufficient factual matter" to establish that the plaintiff suffered injury-in-fact. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

These principles are well illustrated by *Andrx*, where this Court affirmed a district court's Rule 12(b)(6) dismissal of antitrust claims because the plaintiff did not allege facts that could show injury-in-fact. 256 F.3d at 819. The plaintiff, a generic drug manufacturer, claimed that it was injured by a competitor's anticompetitive agreement with a brand-name manufacturer to delay the competitor's introduction of a generic version of the drug Cardizem CD. *Id.* at 807. That agreement, plaintiff alleged, effectively precluded the FDA from approving the plaintiff's pending application to market a generic version of the same drug. *Id.* The Court held that plaintiff did not adequately plead injury-in-fact, because plaintiff "did not explicitly allege [1] that it was prepared to bring a generic version of Cardizem CD to market or [2] that it anticipated FDA approval." *Id.* Accordingly, the Court concluded, "the district court correctly dismissed [plaintiff's] antitrust counterclaim for failure to sufficiently allege injury

22

. . . ." *Id.* at 819; *see also Somers v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013) (affirming dismissal of antitrust claims because plaintiff failed to allege facts that could establish her "overcharge theory" of injury-in-fact).

Here, neither Plaintiffs' dismissed complaints nor their proposed amended complaints alleged facts that could establish injury-in-fact resulting from the Visa or MasterCard ATM access fee rules. Thus, the district court properly dismissed these cases and denied leave for Plaintiffs to amend their complaints.

### B.   All Plaintiffs Failed to Allege Facts That Could Establish Their Purported Injuries Based on ATM Operators' Alleged Inability to Persuade Consumers to Use "Lower Cost" ATM Networks

In their proposed amended complaints — as in their dismissed complaints — all Plaintiffs' claims of injury were predicated on the assertion that, but for Visa's and MasterCard's ATM access fee rules, ATM operators would offer "discounts or [some] other benefit or inducement to persuade consumers to complete their transactions over competing, lower-cost [ATM] networks." JA 395 (*Osborn* Prop. Compl. ¶ 95).[1]   In other words, the district court explained, "Plaintiffs allege that . . . the operators cannot 'steer' consumers to use the 'less costly' networks . . . ."

---

[1] *Accord* JA 464 (*Stoumbos* Prop. Compl. ¶ 45) ("If permitted to do so, ATM operators would have an economic incentive to pass on to customers the benefit of using lower cost, higher net revenue Rival Networks in the form of lower, or discounted, Access Fees."); JA 328 (*NAC* Prop. Compl. ¶ 1) (alleging that the challenged rules "prevent[] ATM operators from steering consumers by way of lower access fees toward using ATM cards attached to one network or another or to unaffiliated networks that are more efficient and less costly than either Visa or MasterCard's."); *see also* JA 65 (*Osborn* Compl. ¶ 75); JA 10-11 (*Stoumbos* Compl. ¶ 36); JA 35 (*NAC* Compl. ¶ 45).

JA 506; *accord* JA 292 ("By preventing ATM operators from charging different ATM access fees to consumers based on the networks their [debit or ATM] cards can access, plaintiffs say, [the challenged rules] effectively prohibit operators from discounting, rebating, or directing consumers to less expensive networks.").

The ATM operator plaintiffs claimed that their inability to offer discounts or other benefits leads ATM operators to pay "artificially high network fees" to Visa and MasterCard.  JA 351 (*NAC* Prop. Compl. ¶ 82); *see also* Pls.' Br. 3 (asserting that ATM operators "pay supra-competitive network service fees").  The consumer plaintiffs claimed that ATM operators' alleged inability to offer those discounts or other benefits leads consumers to pay "supra-competitive prices for ATM Access Fees" to ATM operators.  JA 375, 397 (*Osborn* Prop. Compl. ¶¶ 8, 102-04); *accord* JA 464, 478-79 (*Stoumbos* Prop. Compl. ¶¶ 45, 80); Pls.' Br. 3 (asserting that consumers "pay supra-competitive ATM access fees").

For the reasons described below, Plaintiffs did not allege facts that could establish either of these theories of injury.

> **1.    Plaintiffs Admit That ATM Operators Already Complete Consumers' ATM Transactions Over the "Lowest Cost" Networks Available, Notwithstanding the Challenged Rules**

In dismissing these cases, the district court correctly concluded that Plaintiffs' first amended complaints failed to plead injury-in-fact, because they did not allege that "there is anything barring ATM operators from using the so-called

24

lower cost networks" even with the challenged Visa and MasterCard rules in place. JA 306.  To the contrary, the court found, the ATM operator plaintiffs conceded at oral argument that "it is the ATM operators, and not the consumers, who select which network to utilize for a given transaction," and "that the ATM operators *already automatically* route transactions over the 'lower cost' networks."  JA 312 (citing Sept. 5, 2012 Hr'g Tr. at 54-58 (JA 168-72)) (emphasis in original).

Plaintiffs' proposed second amended complaints did not remedy this defect. The ATM operator plaintiffs again admitted that "[w]hen an ATM has access to multiple networks that match the bug(s) on the customer's card, the ATM operator's processor can choose which network over which to route the transaction and customarily routes the transaction through the 'least costly' network, that is, the network that deducts the lowest network services fee and remits the greatest net interchange."  JA 337 (*NAC* Prop. Compl. ¶ 41).  The consumer plaintiffs similarly admitted that "[w]hen an ATM has access to multiple networks that match the bugs on the customer's card, the ATM operator's processor can and will choose the Network over which to route the transaction.  The ATM operator can and will automatically choose the network that it expects will pay the ATM the highest net interchange fee."  JA 385 (*Osborn* Prop. Compl. ¶ 59); *see also* JA 395 (*Osborn* Prop. Compl. ¶ 97) ("ATMs already route the transaction over the network that

best offsets their costs."); JA 463-64 (*Stoumbos* Prop. Compl. ¶ 43) (stating, without elaboration, that ATM transactions "are routed by the ATM operator").

As in the dismissed complaints, these admissions mean that Plaintiffs' proposed amended complaints failed to allege injury-in-fact. As Plaintiffs conceded, when an ATM customer's card has multiple bugs, the ATM operator is *already* routing the customer's transaction to the ATM operator's preferred, higher paying network, even with the Visa or MasterCard ATM access fee rules in place. There is no injury-in-fact from these consumers' alleged inability to select the network that pays the highest net interchange, because the ATM operator itself selects that highest paying network. Likewise, when an ATM customer's card has only a Visa or MasterCard bug, there is no injury-in-fact because there is no other, higher paying ATM network over which the customer's transaction hypothetically could be completed. *See* JA 511 (district court explaining that "[t]he network is determined by which bugs appear on the [customers'] cards"). In these circumstances, neither the ATM operator plaintiffs nor the consumer plaintiffs alleged injury-in-fact resulting from the challenged rules.

Plaintiffs' brief ignores this key pleading defect. Plaintiffs do not even acknowledge the concession in their proposed amended complaints that ATM operators already route consumers' transactions over the "lowest cost" network available, notwithstanding the challenged rules. Instead, Plaintiffs assert in

26

conclusory fashion that "the proposed [second amended complaints] allege injury in the form of anticompetitive overcharges."  Pls.' Br. 16; *see also id.* at 10-11 (quoting similar conclusory allegations from the proposed amended complaints). In Plaintiffs' view, no more "is required at this stage." *Id.* at 23.  In other words, Plaintiffs assert that their theory of injury "requires only that plaintiffs allege that but for the [challenged rules], consumers would not have paid inflated, supra-competitive ATM access fees," and that "ATM operators would not have [] paid overcharges for network service fees."  *Id.* at 27.

But a plaintiff does not plead injury-in-fact merely by asserting, in a conclusory manner, that it was overcharged as a result of the challenged conduct. Plaintiffs' pleadings "must contain sufficient factual matter" to show that the conduct caused them to be actually overcharged.  *Iqbal*, 556 U.S. at 678; *see also Somers*, 729 F.3d at 963 ("[I]njury is a substantive element of an antitrust claim, and the fact of injury or damage must be alleged at the pleading stage.").

Plaintiffs also suggest that "the mere *threat* of differential access fees by ATM operators would exert enough competitive pressure on Visa and MasterCard to make them lower their network services fees . . . ."  Pls.' Br. 31 (emphasis in original); *see also* JA 351 (*NAC* Prop. Compl. ¶ 83) ("Even the threat of differential pricing would drive competition among networks to charge lower and more competitive network fees.").  The consumer plaintiffs contend that this in

27

turn would lower the access fees they pay.  JA 398 (*Osborn* Prop. Compl. ¶ 106).

But neither Plaintiffs' brief nor their proposed amended complaints offer any

explanation of how or why this might occur.  As the district court found in

dismissing the cases, Plaintiffs alleged "no facts from which the Court can

understand or infer how the access fee . . . relates to the network fee, much less

how . . . the [challenged rules] affect the amount of interchange operators receive."

JA 310.  Plaintiffs' conclusory assertion that a "mere threat" of differential access

fees would lead to lower Visa and MasterCard network fees did not remedy this

defect.

 For the same reason, Plaintiffs' argument that the district court "fail[ed] to

accept alleged anticompetitive overcharges as injury-in-fact" misses the point.

Pls.' Br. 19 (capitalization omitted).  The district court did not dispute that

overcharges can constitute injury-in-fact.  Rather, the court held that Plaintiffs did

not allege facts that could establish they paid the overcharges claimed here as a

result of the challenged ATM access fee rules.  JA 508-15.

   **2. Plaintiffs Did Not Allege That Consumers Have the Ability to Choose the ATM Network Over Which Their ATM Transactions Are Routed**

 In dismissing these cases, the district court also found that Plaintiffs failed to

allege "that a consumer has any opportunity to choose which network will carry his

transaction . . . ."  JA 309 n.15 (discussing *NAC* complaint); *see also* JA 302

(*Osborn* complaint contained no "factual detail that would indicate that consumers have any ability to 'use' competing networks"); JA 306 (*Stoumbos* complaint made no allegations that a "consumer would have any ability to affect which network the operator is using"). The court found that Plaintiffs relied "on a huge number of assumptions," including "that there would be some mechanism whereby [ATM operators] could pass that savings onto consumers by incorporating some sort of consumer network choice into the transaction." JA 307. As the court recognized, unless Plaintiffs can allege that consumers have the ability to choose the ATM network over which a transaction is completed, a consumer could not be persuaded to choose a "lower cost" ATM network by any hypothetical discount that ATM operators might offer.

Plaintiffs' proposed amended complaints failed to remedy this defect as well. The ATM operator plaintiffs made the conclusory allegation that "consumers would respond to lower prices for a fungible service by switching." JA 350 (*NAC* Prop. Compl. ¶ 79). But they alleged no facts showing that a consumer could in fact choose an alternative network at the ATM to complete a transaction.

The consumer plaintiff in *Stoumbos* alleged that ATM technology is capable of identifying the particular ATM network bug, and that software "can also be programmed to show on the screen what discounted Access Fee the customer will receive for the rival network Bugs on his or her card, or can inform the customer

that he or she will not receive an available discount because his or her card does not have a rival network Bug."  JA 480 (*Stoumbos* Prop. Compl. ¶ 85).  But the fact that such information might be made available on a screen does not establish that the consumer can *choose* between networks based on hypothetical differential access fees at the ATM.  Those allegations did not overcome the problem that the district court correctly identified in its first decision dismissing the cases.

Plaintiffs argue that their proposed amended complaints "clearly allege that present-day ATM terminals already have the technical capacity to identify the networks on [a debit or ATM] card, route transactions to the lowest-cost available network, and automatically charge the customer a lower access fee if the card is enabled for a low-cost network."  Pls.' Br. 32 (citing JA 385, 395, 474).  But alleging that *ATM operators* choose the network over which transactions are routed does nothing to show that consumers have the ability to make that choice — it states the opposite.  As described above, moreover, ATM operators' ability to route transactions over the highest paying network available, even with the challenged rules in place, is the key reason the district court correctly dismissed these cases and denied leave to amend.

30

### 3.    The Consumer Plaintiffs' Theory That Card-Issuing Banks Might Enable Cards to Use More Networks Is Based on an Attenuated and Speculative Chain of Events

Echoing arguments made at the motion to dismiss hearing, the proposed amended complaint in *Stoumbos* alleged that, but for the challenged rules, "as consumers become knowledgeable and aware that ATMs offer discount Access Fees for cards with rival network Bugs, consumers will exercise their choice to seek out and use cards embossed with rival Bugs."  JA 480-81 (*Stoumbos* Prop. Compl. ¶ 86) (emphasis added).  Specifically, Stoumbos alleged that "[c]onsumers who do not yet have the rival Bugs will demand that their banks provide new cards with those Bugs or they will open accounts at other banks that do provide them." *Id.*  The consumer plaintiffs in *Osborn* similarly alleged, without elaboration, that "ATM networks could advertise to customers to demand that banks add their 'bug' to their debit cards in order to pay lower transaction fees."  JA 397 (*Osborn* Prop. Compl. ¶ 104); *see also* JA 395 (*Osborn* Prop. Compl. ¶ 96) (alleging that the challenged rules "extinguish the incentive of cardholders to demand, and providers of ATM network services to provide, lower-cost, more efficient services").

This theory of injury is too speculative to state a claim for relief under the Clayton Act.  In evaluating antitrust standing, including at the pleading stage, courts must consider "the directness or indirectness of the asserted injury." *Associated Gen. Contractors*, 459 U.S. at 540; *accord Andrx*, 256 F.3d at 806, 815.

31

In *Associated General Contractors*, the Supreme Court held that the plaintiff

lacked standing under Section 4 of the Clayton Act, in part because its alleged

injury was "highly speculative." 459 U.S. at 542. Specifically, the Court

explained, "the chain of causation between the [plaintiff's] injury and the alleged

[antitrust violation] contains several somewhat vaguely defined links." *Id.* at 540.

Because the plaintiff failed to allege facts that could establish and connect those

links, the Court concluded that "nothing but speculation informs the [plaintiff's]

claim of injury by reason of the alleged [violation]." *Id.* at 543.

This Court likewise has held that "[a]ntitrust standing requires proximity

between the alleged cause and the alleged injury." *Andrx*, 256 F.3d at 816 n.19;

*see also id.* at 807 n.11 ("The issues of injury-in-fact and causation are closely

linked . . . ."). Thus, to state an antitrust claim, a plaintiff must plead facts to

establish that the "alleged injury possesses a sufficiently direct causal relationship

to the alleged wrongdoing." *Serv. Emps. Int'l Union Health and Welfare Fund v.*

*Philip Morris Inc.*, 249 F.3d 1068, 1072 (D.C. Cir. 2001). Plaintiffs do not

adequately plead injury-in-fact when "the[ir] alleged injuries . . . are too remote to

have been proximately caused by the defendants' alleged conduct." *Id.* at 1069.

In asserting that consumers could choose a "lower cost" network by

demanding that their banks provide debit or ATM cards with more network bugs or

opening new accounts at other banks to get new cards with more network bugs, the

32

consumer plaintiffs failed to plead a basis for injury-in-fact under this standard.  As the district court correctly concluded, this theory is "too speculative" to show injury-in-fact resulting from the challenged Visa and MasterCard rules, because it "is based on an attenuated, speculative chain of events, that relies on numerous independent actors, including the [] card issuing banks."  JA 512.

Specifically, the consumer plaintiffs' alleged injury could materialize only if all of the following events occur:

(a) a consumer undertakes the effort of either soliciting his or her card-issuing bank for a new card with alternative bugs or opening a new deposit account at a bank that offers a card with alternative bugs — all in order to receive a small discount on an access fee for a foreign ATM transaction;

(b) sufficient numbers of consumers approach the card-issuing bank or open new accounts elsewhere to make it worthwhile for the bank to consider adding bugs of ATM networks that will require the bank to pay higher interchange fees than those established by Visa or MasterCard — even though, as Plaintiffs concede, Visa and MasterCard compete for bank card issuance by offering banks the ability to pay *lower* interchange fees, JA 392-93 (*Osborn* Prop. Compl. ¶¶ 88-90);

(c) the consumer then uses an ATM that accepts the alternative bugs on the consumer's new card;

(d) the ATM operator for that machine actually lowers the access fee for transactions using the alternative bugs from the levels currently existing, as opposed to raising the access fee on transactions over the Visa and MasterCard networks; and

(e) the card-issuing bank that either adds more bugs to cards or at which a consumer opens a new account to obtain a card with more bugs does not recoup the higher interchange it pays by imposing new or higher

33

fees on the cardholder that would offset any savings to the cardholder from a possible lower access fee on foreign ATM transactions.

As was true in the dismissed complaints, this theory of injury "depends on a huge number of assumptions" (JA 307) and is highly attenuated and speculative. And plaintiffs failed to allege facts that could support those assumptions.

Any injury to the ATM operator plaintiffs based on this theory would be even more speculative.  It would depend on a showing that, but for the challenged Visa and MasterCard rules, consumers would successfully pressure banks to add alternative bugs to their cards or open new deposit accounts to get new cards in the manner described above.  The ATM operator plaintiffs then also would have to show that the hypothetical addition of alternative network bugs or consumers' hypothetical new cards would lead to greater profits for ATM operators, by either (a) increasing the number of ATM transactions over "lower cost," more profitable alternative networks, or (b) causing Visa and MasterCard to raise the net interchange fee remitted to ATM operators.  Any assertion that these events would occur is pure guesswork — and, again, is not even alleged.

Plaintiffs criticize the district court for supposedly theorizing a "but-for world" in which "'ATM operators would offer consumers differentiated access fees at the point of the transaction, consumers would then demand multi-bug [] cards from their banks, their banks would provide these cards, . . . all resulting in more choice of networks and lower access fees for consumers.'"  Pls. Br. 29

34

(quoting JA 511 (district court decision denying leave to amend)).  According to Plaintiffs, this "show[s] that the court confused allegations of how the challenged restraints caused injury with how the injury would be remedied absent the challenged [rules]."  *Id.* at 29-30.  But the consumer plaintiffs — not the district court — alleged the speculative and attenuated theory that consumers might demand new debit or ATM cards from their banks with more network bugs.  And the consumer plaintiffs alleged that theory of injury only after admitting that ATM operators already route transactions over the highest paying network enabled by consumers' current cards.  The district court simply concluded that the *consumer plaintiffs'* new theory was too speculative to establish injury-in-fact.

At bottom, Plaintiffs claim that they can address all of these problems "in expert opinion testimony at the merits stage" and ignore them "at the pleading stage."  Pls.' Br. 34.  But in a private antitrust action, "[t]he plaintiff's first step is to plead injury-in-fact or, in a suit for equitable relief, a threatened injury-in-fact to business or property."  *Andrx*, 256 F.3d at 806.  To satisfy this pleading requirement, the plaintiff's claimed injury-in-fact must not be "speculative."  *Id.* (quoting *Associated Gen. Contractors*, 459 U.S. at 545).  As the Second Circuit has stated, "[a]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a

matter of law." *Gatt Commc'ns, Inc. v. PMC Assoc., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013) (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007)).

Plaintiffs' theories of injury-in-fact are speculative and unsupported by factual allegations in their proposed second amended complaints. Accordingly, this Court should affirm the district court's decision denying leave to amend.[2]

## II. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS' PROPOSED SECOND AMENDED COMPLAINTS FAILED TO PLEAD FACTS THAT COULD ESTABLISH AN ANTITRUST CONSPIRACY

The district court also denied leave to amend on the independent ground that Plaintiffs' proposed second amended complaints — like their dismissed first amended complaints — failed to plead facts that could establish an actionable conspiracy to impose the challenged Visa and MasterCard rules. JA 314; *see also* JA 515 (decision dismissing cases). That decision too is correct.

Section 1 of the Sherman Act prohibits a "contract, combination . . . or conspiracy, in restraint of trade." 15 U.S.C. § 1. Accordingly, a plaintiff asserting a Section 1 claim must establish that "the challenged anticompetitive conduct stems from . . . an agreement, tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (internal quotation marks omitted). To survive dismissal, the

---

[2] In light of the dispositive pleading deficiencies described above, this Court need not address the district court's additional conclusions that "the challenged rules do not prevent operators from increasing access fees across the board," or that "operators can pass the economic impact of higher network fees on to consumers . . . ." JA 510; *see also* Pls.' Br. 35-38 (addressing these additional issues).

plaintiff's complaint must allege "enough factual matter (taken as true) to suggest that an agreement was made" and "that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 556-57. This Court and other courts of appeals have rejected Section 1 claims at the pleading stage based on plaintiffs' failure to allege an antitrust conspiracy. *See, e.g.*, *Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1064-66 (D.C. Cir. 1992); *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135-40 (2d Cir. 2013); *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225-30 (3d Cir. 2011).

Plaintiffs make clear that their Section 1 conspiracy claims are "based on an express contract: the written rules developed and adopted by the members of the defendant bankcard associations." Pls.' Br. 16; *accord id.* at 38-39 (asserting that "this case is about express contracts between each defendant and each of their member banks"). Plaintiffs argue that the challenged network rules are the product of "horizontal" conspiracies among competing banks and Visa, and among competing banks and MasterCard. *Id.* at 38, 47. Alternatively, Plaintiffs contend that the rules are the product of "vertical" conspiracies between each network and its member banks. *Id.* at 44. But regardless of whether Plaintiffs characterize the alleged agreements as horizontal or vertical, they failed to plead facts giving rise to a plausible inference of the "conscious commitment to a common scheme designed

to achieve an unlawful objective" that is required for any Section 1 conspiracy.

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).

### A. Plaintiffs Did Not Allege Facts That Could Establish a Horizontal Agreement Among the Bank Members of Visa or MasterCard

#### 1. Allegations That Banks Were Members of Visa or MasterCard and Agreed to Follow its Network Rules Could Not Establish That the Banks Agreed Horizontally

Plaintiffs' horizontal conspiracy theory is predicated upon the purported direct agreements between each defendant network and its bank members to "develop[] and adopt[]" the ATM access fee rules during the period prior to each network's IPO when the defendants were organized as associations of banks. Pls.' Br. 16. Plaintiffs assert that despite MasterCard's IPO in 2006 and Visa's IPO in 2008, the access fee rules did not change and thus remain the product of a horizontal agreement. *Id.* at 16, 38-41.

Plaintiffs argue, incorrectly, that the district court "ignored that this case is about express contracts between each defendant and each of their member banks." Pls.' Br. 38-39. In fact, the district court recognized that "Plaintiffs' claims of an agreement or conspiracy . . . rest on the allegation that before Visa and MasterCard became publicly held corporations, their member banks created the associations' rules and regulations containing the access fee rules that remain in place today." JA 315; *see also* JA 516. Rather than ignoring this allegation, the court correctly held that "membership in an association — much less membership in a defunct

38

organization — is not enough to establish agreement or conspiracy." JA 516; *see also* JA 317. And the proposed amended complaints alleged "no additional facts . . . that would support a claim of a current horizontal conspiracy among the member banks." JA 516.

Courts repeatedly have held that merely being a member of an association and following the association's rules is insufficient as a matter of law to establish that the members of the association conspired horizontally among themselves and with the association to restrain trade. For instance, in *Federal Prescription Service, Inc. v. American Pharmaceutical Association*, 663 F.2d 253 (D.C. Cir. 1981), this Court rejected a Sherman Act Section 1 claim of horizontal conspiracy based on pharmaceutical associations' membership in the American Pharmaceutical Association. The Court held that "[m]ere membership in associations is not enough to establish participation in a conspiracy with other members of those associations, much less in a conspiracy between those associations and yet another association." *Id.* at 265.

As the district court recognized, the Ninth Circuit applied the same reasoning in affirming the dismissal of Section 1 claims challenging different Visa and MasterCard rules established when each network was an association. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008). In *Kendall*, merchants alleged that the banks, by virtue of their membership in Visa and MasterCard,

39

"knowingly, intentionally and actively" conspired to enforce Visa and MasterCard

network rules that allegedly fixed interchange fees as the minimum fee that banks

would charge merchants on payment card transactions. *Id.* at 1048. In affirming

the dismissal of that claim, the Ninth Circuit held that "merely charging, adopting

or following the fees set by [Visa or MasterCard] is insufficient as a matter of law

to constitute a violation of Section 1 of the Sherman Act." *Id.* The court reasoned

that "membership in an association does not render an association's members

automatically liable" under antitrust law for the association's activities. *Id.*

Other courts of appeals have reached the same conclusion in other contexts.

*See*, *e.g.*, *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 764 (5th Cir. 2002)

(an association "is not by its nature a 'walking conspiracy,' its every denial of

some benefit amounting to an unreasonable restraint of trade"); *AD/SAT, A Div. of

Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) ("every action

by a trade association is not concerted action by the association's members").

*Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278 (4th Cir. 2012), cited

by Plaintiffs, addressed a very different factual scenario. In *Robertson*, individual

real estate brokerages formed a joint venture known as the "multiple listing

service," which the venture's member brokerages used to post and find property

listings. *Id.* at 282. In contrast to Plaintiffs' allegations here, the plaintiffs in

*Robertson* alleged that the venture's members specifically agreed with each other

40

to engage in a variety of anticompetitive acts (including exclusionary conduct directed at members' competitors) through the venture while controlling its activities. *Id.* at 283, 288-89.

Moreover, Plaintiffs' claims are even less viable than those in *Kendall* because Visa and MasterCard are no longer associations, but rather public corporations run by independent boards of directors not controlled by banks. JA 317-18. As the district court found, because member banks do not control Visa or MasterCard after the IPOs, "there is no basis to conclude the corporations are simply a shell through which the banks continue a horizontal agreement." JA 516; *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2008 WL 5082872, at *10 (E.D.N.Y. Nov. 25, 2008) (granting motion to dismiss Section 1 claim in part because plaintiffs failed to allege facts demonstrating that banks continued to control MasterCard after its IPO). None of Plaintiffs' proposed amended complaints "alleged that the banks agreed among themselves to do anything" after the IPOs. JA 315; *accord* JA 515 ("Allegations that the member banks made a prior agreement when they were members of the bankcard associations do not suffice to allege a current agreement.").

Plaintiffs argue that the banks and Visa, and the banks and MasterCard, never "withdrew" from the asserted pre-IPO conspiracies after the IPOs. Pls.' Br. 40. But even if there were any conspiracies, the IPOs terminated the asserted bank

41

control over the Visa and MasterCard rules on which those alleged conspiracies are premised.  Moreover, to withdraw from a "conspiracy," there need only be "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464-65 (1978).  Here, despite Plaintiffs' conclusory assertion that the "IPOs were changes in form only, not in substance" (Pls.' Br. 40), the IPOs themselves were public and widely reported affirmative acts that removed the alleged structure and mechanism of the conspiracy in a way that was fundamentally inconsistent with the asserted object of the alleged conspiracies, *i.e.*, allowing the banks to restrain trade by collectively determining the network access fee rules of Visa and MasterCard.

### 2.    Plaintiffs Alleged No Facts That Could Establish a Horizontal Agreement Under *American Needle*

Plaintiffs' reliance on *American Needle, Inc. v. NFL*, 560 U.S. 183 (2010), is misplaced.  In that case, the Supreme Court considered whether an agreement by the NFL teams to license their independently owned team trademarks under common, exclusive terms through the NFL constituted concerted action under Sherman Act Section 1.  The Court explained that whether a decision of a jointly owned entity, like the NFL, constitutes concerted action under Section 1 depends on whether the decision "depriv[es] the marketplace of independent centers of decisionmaking," and "therefore of actual or potential competition."  *Id*. at 197.

42

Because the Court determined that each NFL team competed in a market for team licenses, a decision by the teams to cede their individual trademark licensing rights to the NFL deprived the marketplace of those independent decisionmakers.

As the district court correctly held, that is not the case here. "[T]here is no allegation that the independent banks are currently joined together in a collective entity for decision-making purposes." JA 322. Moreover, whereas in *American Needle* each NFL team owned the licensing rights to its team trademark that it ceded to the league, Plaintiffs here did not and cannot allege that any bank independently had authority to determine Visa or MasterCard ATM access fee rules that the bank could have ceded to Visa and MasterCard. Absent any independent network rulemaking power that a bank could cede to Visa or MasterCard, Plaintiffs' allegations could not plead a conspiracy to restrain trade under *American Needle*. JA 321-22. Likewise, Plaintiffs did not allege that the challenged rules prohibit any bank from deciding independently whether to charge a particular access fee, if any, at any ATM it operates, or from individually deciding to charge different access fees at different ATMs. Plaintiffs' citations to a treatise and law review article discussing *American Needle* are not to the contrary. *See* Pls.' Br. 41-42.

### 3. Plaintiffs Alleged No Facts That Could Establish That the Banks Agreed Horizontally with Each Other in a "Hub and Spoke" Conspiracy

Plaintiffs assert that they have set forth allegations that "amount to two complete hub, spoke, and wheel structures, with Visa and MasterCard at the two respective hubs, the vertical access fee restraints at the spokes, and horizontally competing banks at the rim." Pls.' Br. 47. Plaintiffs are incorrect.

To plead a horizontal hub-and-spoke conspiracy, a plaintiff must allege sufficient facts establishing an agreement among the downstream competing participants in the alleged conspiracy — a "wheel" or "rim" — and not solely "spoke" agreements between the hub and its individual contracting parties. *See, e.g.*, *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 420 (5th Cir. 2010) (affirming dismissal of Section 1 claim because plaintiffs alleged "no wheel and therefore no hub-and-spoke conspiracy"); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010) (same).[3] Plaintiffs identify no facts that could establish that every bank in Visa's or MasterCard's ATM network entered

---

[3] *See also Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (holding that "the Section 1 claim fails as a matter of law" because "the critical issue for establishing a . . . violation with the hub and spoke system is how the spokes are connected to each other," and plaintiffs' pleading "offer[ed] only a rimless theory"); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002) ("[A] wheel without a rim is not a single conspiracy. Thus, we agree with the district court that [the plaintiff's] attempt to plead a single, rimless wheel conspiracy between the OEM Defendants and Microsoft must be rejected."); *cf. United States v. Mathis*, 216 F.3d 18, 24 (D.C. Cir. 2000) ("[C]ompeting spoke suppliers in a hub conspiracy must not only have a connection to the hub sellers but must also have interdependence among each other in order to form a rim and constitute a single conspiracy.").

into an agreement with every other bank in that network to restrain trade through the access fee rules.  In fact, Plaintiffs made no allegation that *any* bank ever discussed with *any other* bank whether they would abide by the challenged network rules.  *See PepsiCo v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (affirming summary judgment where plaintiffs failed to proffer evidence of direct communications between the spokes of the alleged hub-and-spoke conspiracy).  Thus, the "rim" connecting the various "spokes" is missing.

Plaintiffs also failed to allege facts analogous to those found sufficient to infer a "rim" in *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), and *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000), the two cases on which Plaintiffs principally rely.  Both decisions turned on facts not alleged in this case.  In *Interstate Circuit*, the Supreme Court emphasized that the evidence demonstrated that "[c]ompliance with the proposals involved a radical departure from the previous business practices of the industry and a drastic increase in . . . prices," "negotiations which ensued and which in fact did result in modifications of the proposals," and "substantial unanimity" in "far-reaching changes in their business methods."  306 U.S. at 222-23.  In *Toys "R" Us*, the Seventh Circuit underscored Toys "R" Us's complicity in "the manufacturers' decision to stop dealing with the warehouse clubs [in] an abrupt shift from the past," and that there

was "direct evidence of communications" among the manufacturers about their responses to that shift in policy. 221 F.3d at 935.

Here, Plaintiffs did not allege facts establishing that Visa's or MasterCard's ATM access fee rule was a radical or abrupt change from past industry practices or that there were negotiations or communications among the banks regarding those rules. Moreover, because there are sound reasons why a bank would join the Visa or MasterCard ATM networks regardless of whether its competitor did so, Plaintiffs pled nothing that "tends to exclude" the possibility that the alleged conspirators acted independently. *Id.* at 934 (citing *Monsanto*, 465 U.S. at 764); *see also* JA 298, 517, 518. The district court thus correctly held in reviewing the prior pleadings that "[t]hese complaints do not have the additional facts that were important in both *Interstate* and *Toys "R" Us*: the restraints here are not a sudden break from past practice that would be inexplicable without the agreement, as in *Interstate*; and they are not contrary to the banks' own interests or dependent on all banks participating, like the sales boycott executed by manufacturers in *Toys "R" Us*." JA 320-21. That conclusion should be affirmed.

Citing a single district court decision, Plaintiffs also assert that parties to vertical agreements may be considered participants in a horizontal conspiracy if they have "knowledge that other market participants are bound by identical agreements, and their participation is contingent upon that knowledge." Pls.' Br.

46

48 (quoting *Laumann v. NHL*, 907 F. Supp. 465, 486-87 (S.D.N.Y. 2012)).  But even if that approach were adopted in this Circuit, Plaintiffs did not allege facts that could establish that any individual bank's participation in either network was "contingent" on another bank's participation.

Further, even if each bank "knew" that every other bank would be subject to the network rules, that knowledge could not exclude the possibility that the banks were acting independently in their own self-interest.  *See Matsushita Elec.*, 475 U.S. at 588; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 331 ("allegations that each insurer knew about the competitive protections purchased by the other insurer-partners manifestly do not describe [] . . . a horizontal conspiracy to unreasonably restrain trade") (internal quotation marks omitted); *PepsiCo*, 315 F.3d at 110 (fact that Coca Cola assured its independent distributors that its "loyalty policy would be uniformly enforced . . . was insufficient evidence of a horizontal agreement to withstand summary judgment").  Rather, as the district court correctly held, Plaintiffs' allegations show that the banks "have reasons to join or stay in the Visa and MasterCard networks based on their individual interests," which "weighs against an inference of an agreement."  JA 517, 518.

### B.    Plaintiffs Did Not Allege Facts That Could Establish Vertical Conspiracies Among Individual Banks and Visa or MasterCard

Plaintiffs attempt to salvage their invalid conspiracy claims by alternatively repackaging them as "vertical" conspiracies.  JA 413-16 (*Osborn* Prop. Compl.

47

¶¶ 155-70); JA 488 (*Stoumbos* Prop. Compl. ¶ 113); JA 364-66 (*NAC* Prop.

Compl. ¶¶ 125-34); *see also* Pls.' Br. 44-47.  That attempt fails as a matter of law.

　　While Plaintiffs assert that the district court "ignored" their new vertical

theory (Pls.' Br. 44),[4] the court's decisions amply support rejecting Plaintiffs'

proposed vertical conspiracy claims as futile.  Plaintiffs' vertical theory amounts to

nothing more than an allegation that every bank in the United States, including the

three defendant banks, agreed to conspire with Visa or MasterCard merely by

agreeing to follow its network rules.  But, as stated above, courts routinely reject

Section 1 claims alleging that individual acceptance of the rules of an organization

constitutes a "conscious commitment to a common scheme designed to achieve an

unlawful objective."  *Monsanto Co.*, 465 U.S. at 764; *see, e.g.*, *Am. Airlines v.*

*Christensen*, 967 F.2d 410, 413-14 (10th Cir. 1992) (mere acceptance by members

of terms of airline's rewards program does not result in concerted action sufficient

to support a Section 1 violation); *Toscano v. Prof'l Golfers' Ass'n*, 258 F.3d 978,

984 (9th Cir. 2001) (dismissing professional golfer's claim that local sponsors

conspired with PGA by agreeing to follow PGA rules because that showed "only

that the local sponsors accepted the fact that the tournaments would be operated

---

[4] The district court's finding that "the conspiracy claims lack the one thing they need:  a conspiracy" (JA 518) was not limited to horizontal allegations of conspiracy.

48

according to the PGA Tour's rules . . . not that they agreed to use those rules to restrain trade").

Further, Plaintiffs failed to plead any facts that could demonstrate that any individual relationship between a bank and a network violates the rule of reason, which they must do to state a vertical claim under Section 1. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 898-99, 907 (2007) (holding that all vertical restraints are to be evaluated under the rule of reason). To state a viable Section 1 claim under the rule of reason, a plaintiff must allege "the likelihood of a substantial anti-competitive harm caused by the . . . agreements at issue (considered individually), an inquiry that requires [the plaintiff] to allege facts demonstrating 'that the defendants played a significant role in the relevant market.'" *Dickson v. Microsoft Corp.*, 309 F.3d 193, 207 (4th Cir. 2002) (quoting *Oksasen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991)). Thus, "[t]o allege a vertical restraint claim sufficiently, a plaintiff must plausibly allege the defendant's market power." *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418-19 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 1476 (2011).

Contrary to Plaintiffs' assertions, in *Dickson* the Fourth Circuit affirmed the dismissal of Section 1 claims in which the plaintiff challenged two vertical agreements between Microsoft (the operating system manufacturer) and Compaq and Dell (two computer manufacturers). 309 F.3d at 211. The court of appeals

49

held that the plaintiff had failed to allege facts that, if proven, would show that the agreement between Compaq and Microsoft and the agreement between Dell and Microsoft were each, separately and alone, likely to cause anticompetitive effects. *Id.* Critical to the court's decision was the plaintiff's failure to allege facts demonstrating Compaq's or Dell's market power or market share. Allegations that Compaq and Dell were the "largest PC makers" and were "among the largest distributors of Microsoft's products" were insufficient to survive a motion to dismiss because "[b]eing the 'largest' in a relevant market . . . says nothing of a firm's ability to affect competition in that market." *Id*. at 210 n.20.

In short, "each [vertical] agreement must be treated as a separate conspiracy, and only acts taken in furtherance of that alleged conspiracy are appropriately considered in determining the adverse effects of the claimed restraints on trade, not acts of one conspirator taken in furtherance of other possible, distinct conspiracies." *Id*. at 211; *see also Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 256 (3d Cir. 2010) (noting that a complaint alleging several unconnected, bilateral, vertical conspiracies would require plaintiffs "to allege that every single agreement between Dentsply and each Dealer had anticompetitive effects").

Here, Plaintiffs failed to allege facts that could show that any single bank defendant's decision to join the Visa or MasterCard ATM networks has caused

anticompetitive effects in any relevant market.  Plaintiffs assert that "the anticompetitive effects of the [challenged rules] are the same whether viewed as horizontal or vertical . . . ."  Pls.' Br. 46.  As support, however, Plaintiffs cite complaint allegations that involve only network-wide effects from a claimed horizontal conspiracy among competing banks, not anticompetitive effects from any individual bank's agreement with Visa or MasterCard.  *Id.* at 46-47 (citing JA 395-98 (*Osborn* Prop. Compl. ¶¶ 94-107); JA 479-82 (*Stoumbos* Prop. Compl. ¶¶ 82-88); JA 349-53 (*NAC* Prop. Compl. ¶¶ 77-88)).  Also, Plaintiffs' allegations that Visa and MasterCard "possess [] market power" are insufficient; because Plaintiffs have alleged no facts to demonstrate any individual bank defendant's market power or share in any purported ATM services market, their vertical claims fail as a matter of law.  JA 357 (*NAC* Prop. Compl. ¶ 105); *accord* JA 401 (*Osborn* Prop. Compl. ¶ 127); JA 486 (*Stoumbos* Prop. Compl. ¶ 105).

In addition, Plaintiffs cannot cure the defects in their horizontal conspiracy allegations by recasting them as a series of unconnected separate vertical agreements between each bank and Visa or MasterCard.  JA 413 (*Osborn* Prop. Compl. ¶ 156); *accord* JA 488 (*Stoumbos* Prop. Compl. ¶ 113); JA 365 (*NAC* Prop. Compl. ¶ 130).  The ATM operator plaintiffs candidly admit that the post-IPO agreements "have precisely the same horizontal, pre-IPO interbrand effects on competition," and that the "only 'vertical' element in this arrangement, therefore,

51

is an artifice of the formation of separate entities . . . which creates the appearance of a 'vertical' agreement between the banks and the network defendants." JA 356-57 (*NAC* Prop. Compl. ¶ 103).

This pleading tactic cannot avoid dismissal here. In a similar circumstance, where plaintiffs tried to "hedge their bets" by pleading both horizontal and vertical conspiracies based on the same set of facts, the Third Circuit held that it had "an obligation to read allegations not in isolation but as a whole and in context. . . . [T]he Plaintiffs are bound by the four corners of their amended complaint, which clearly seeks to allege one conspiracy. . . . To the extent the Plaintiffs are recasting their allegations in an effort to circumvent a motion to dismiss, we must reject that approach." *Howard Hess Dental Labs.*, 602 F.3d at 256-57. So too, here.

## III.   ALTERNATIVELY, THIS COURT CAN AFFIRM THE DECISION BELOW ON THE GROUND THAT PLAINTIFFS CANNOT MEET THE STANDARD TO ALTER OR AMEND THE JUDGMENT

Even if this Court were to conclude that the proposed amended complaints would survive a motion to dismiss, Plaintiffs still face another, insurmountable obstacle to amending. In its first decision, the district court dismissed the *cases* without prejudice, and Plaintiffs do not challenge that decision in this appeal. JA 284 (Feb. 13, 2013 Order stating: "The above-captioned cases are DISMISSED without prejudice."); JA 499-500 (Dec. 19, 2013 Mem. Op. stating: "On February 13, 2013, the court dismissed the lawsuits without prejudice . . . .").

Plaintiffs could not file amended complaints in dismissed cases, and thus seek to toll the statute of limitations, unless the district court first altered or amended its judgment under Rule 59(e) to allow Plaintiffs to do so. Thus, after the district court dismissed the cases, Plaintiffs filed Rule 59(e) motions to alter or amend the judgment to dismiss only their complaints, and not the "cases," so that Plaintiffs could seek leave to amend their complaints. Doc. 36 (No. 1:11-cv-01803); Doc. 59 (No. 1:11-cv-01831); Doc. 29 (No. 1:11-cv-01882). Because the court denied leave to amend, it denied Plaintiffs' Rule 59(e) motions as moot. JA 497-98.

But if the issue is not moot, this Court should hold that Plaintiffs fail to meet the stringent standard under Rule 59(e) to amend a judgment. "[O]nce a final judgment has been entered, a court cannot permit an amendment unless the plaintiff 'first satisf[ies] Rule 59(e)'s more stringent standard' for setting aside the judgment." *Ciralsky v. CIA*, 355 F.3d 661, 673 (D.C. Cir. 2004) (citation omitted). Specifically, the movant must show "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Id.* at 671 (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)).

Plaintiffs did not — and cannot — satisfy this standard. Plaintiffs cannot identify any change of controlling law or new evidence that has become available

since the district court dismissed these cases.  Nor can Plaintiffs establish any clear error or "manifest injustice" that must be prevented by altering the judgment in these cases.  This means that even if Plaintiffs' proposed amended complaints could survive a motion to dismiss, Plaintiffs could not file those amended complaints in these dismissed cases, but rather would need to file new cases.

Plaintiffs' inability to satisfy Rule 59(e) is not merely technical, but rather has a substantive effect on Plaintiffs' case, Defendants' defenses, and the potential damages period.  For example, any new actions that Plaintiffs file would be governed by the antitrust laws' four-year statute of limitations, "unaffected by the filing of the [now dismissed] suit."  *Ciralsky*, 355 F.3d at 672.  As this Court explained in *Ciralsky*, although the timely filing of a complaint tolls the statute of limitations with respect to amended complaints permitted under Rule 15(a), "once a suit is dismissed, even without prejudice, 'the tolling effect of the filing of the suit is wiped out and the statute of limitations is deemed to have continued running from whenever the cause of action accrued, without interruption by that filing.'" *Id.* (citation omitted).

## CONCLUSION

For the foregoing reasons, the district court's decision should be affirmed.


Dated:  October 2, 2014

/s/ Kenneth A. Gallo
Kenneth A. Gallo
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC  20006
(202) 223-7300
kgallo@paulweiss.com


Andrew C. Finch
Gary R. Carney
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 373-3000
afinch@paulweiss.com


*Counsel for Defendants-Appellees
MasterCard Incorporated and
MasterCard International
Incorporated*

Respectfully submitted,

/s/ Mark R. Merley
Mark R. Merley
Matthew A. Eisenstein
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004
(202) 942-5000
Mark.Merley@aporter.com


*Counsel for Defendants-Appellees
Visa Inc., Visa U.S.A. Inc., Visa
International Service Association, and
Plus System, Inc.*


/s/ Peter E. Greene
Peter E. Greene
Boris Bershteyn
Peter S. Julian
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
(212) 735-3000
pgreene@skadden.com


*Counsel for Defendants-Appellees
JPMorgan Chase & Co.,
JPMorgan Chase Bank, N.A., and
Chase Bank USA, N.A.*

/s/ Mark P. Ladner
Mark P. Ladner
Michael B. Miller
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019-9601
(212) 336-4257
mladner@mofo.com

*Counsel for Defendants-Appellees*
*Bank of America Corporation,*
*Bank of America, N.A., and*
*NB Holdings Corporation*

/s/ William F. Cavanaugh
William F. Cavanaugh
PATTERSON BELKNAP WEBB &
  TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
wjcavanaugh@pbwt.com

*Counsel for Defendants-Appellees*
*Wells Fargo & Company and*
*Wells Fargo Bank, N.A.*

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), that

the foregoing *Brief for Appellees*:

(1) contains 12,957 words;

(2) complies with the typeface requirements of Federal Rule of Appellate

Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate

Procedure 32(a)(6) because it has been prepared in a proportionally spaced

typeface using Word 2007, in 14-point Times New Roman font; and,

(3) has been scanned for viruses using Sophos Endpoint Security (version

9.7) and is free from viruses.


Dated:  October 2, 2014                    /s/  Mark R. Merley
                                           Mark R. Merley

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2014, I caused the foregoing *Brief for Appellees* to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit via the Court's appellate Case Management/Electronic Case Files (CM/ECF) system.  Participants in the case who were registered CM/ECF users were served by the CM/ECF system at that time.

Further, I hereby certify that on October 2, 2014, I caused nine (9) paper copies to be served on the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit via a third party commercial carrier.  I also caused two paper copies to be served via Federal Express Priority Overnight on the following parties:

Michael G. McLellan
Douglas G. Thompson
FINKELSTEIN THOMPSON LLP
1077 30th Street NW, Suite 150
Washington, DC  20007
(202) 337-8000

*Counsel for Plaintiff Mary Stoumbos*

Brooks E. Harlow
LUKAS, NACE, GUTIERREZ &
  SACHS LLP
8300 Greensboro Drive, Suite 1200
McLean, VA  22102
(703) 584-8680

Don A. Resnikoff
5335 Wisconsin Ave. NW, Suite 440
Washington, DC  20015
(202) 344-0089

*Counsel for Plaintiffs National ATM Counsel, Inc. and the ATM Operators*

Steve W. Berman
HAGENS BERMAN SOBOL
  SHAPIRO LLP
1918 Eighth Ave., Suite 3300
Seattle, WA  98101
(202) 623-7292

Jennifer Fountain Connolly
HAGENS BERMAN SOBOL
  SHAPIRO LLP
1701 Pennsylvania Ave. NW,
  Suite 300
Washington, DC  20006
(202) 248-5403

Craig L. Briskin
MEHRI & SKALET, PLLC
1250 Connecticut Ave. NW,
  Suite 300
Washington, DC  20036
(202) 822-5100

*Counsel for Plaintiffs Sam Osborn,*
*Andrew Mackmin, Barbara Inglis,*
*and John Epseland*

Dated:  October 2, 2014                    /s/ Mark R. Merley
                                           Mark R. Merley